HEARD NOVEMBER TERM, 1872.

## BEALL *vs.* LOWNDES.

Two several firms may, by their course of dealing with a third party, as by holding out the idea that they constitute but one firm, incur, as to him, a joint liability to the same extent as if they did in fact constitute but one partnership.

It is a well established principle of private international law that real estate is exclusively subject to the laws of the country where it is situated, and will not pass by an assignment under the bankrupt law of a foreign government.

Where a deed of inspectorship, under the bankrupt law of England, contains an express saving of the rights of the creditors against any person or persons who may be jointly liable with the debtors for any of the debts, acceptance of the deed by a creditor will not discharge a party in South Carolina who is jointly liable for the debt.

A trust deed for the benefit of creditors is not revokable at the will of the debtor and grantor.

A creditor for whose benefit a trust is created will not be held to have renounced the benefit without clear proof of an intention to do so.

Mere delay in accepting the provisions of a trust deed for the benefit of creditors will not bar a creditor where the deed fixes no time for acceptance.

BEFORE GRAHAM, J., AT CHARLESTON, AUGUST, 1874.

These were two actions in the form of creditors' bills, one by William A. Beall and the other by Jeremiah Beall, plaintiffs, against Charles T. Lowndes and James Robb, defendants.

For a full understanding of the case it is sufficient to state that in the years 1866 and 1867 there was a firm doing business in the city of Charleston, South Carolina, under the name of John Fraser & Co., and also a firm doing business in the city of Liverpool, England, under the name of Fraser, Trenholm & Co. The members of the first named firm were T. D. Wagner, W. L. Trenholm, C. K. Prioleau, B. F. Huger and F. Fanning; and those of the second were T. D. Wagner, L. T. Welsman, W. L. Trenholm, C. K. Prioleau and John R. Armstrong.

In 1867 the firm of Fraser, Trenholm & Co. went into bankruptcy in England, and on the 11th day of November of that year they executed a deed of inspectorship, under the bankrupt laws of that country. The only provisions of this deed, relating to points made in the case, are recited at length in the opinion of the Court. The deed was assented to by the plaintiffs in writing, their assent stating that " this assent is without prejudice to any liens or securities held by the undersigned, or to their rights and remedies against third parties."

On the 25th day of November, 1867, T. D. Wagner and W. L. Trenholm executed in Charleston, South Carolina, an instrument, in words and figures as follows :

"*Memorandum of Agreement* made and entered into this twenty-fifth day of November, Anno Domini one thousand eight hundred and sixty-seven, between Theodore D. Wagner and William L. Trenholm, in behalf of John Fraser & Co., and of Fraser, Trenholm & Co , and the several parties whose names are hereto signed, creditors of either or both of the said copartnerships.

"1. In consideration of the execution of these presents by Theodore D. Wagner and William L. Trenholm, it is agreed that all suits now pending against John Fraser & Co., and Fraser, Trenholm & Co., and instituted by parties, subscribers to this agreement, shall be stayed.

"2. Theodore D. Wagner and William L. Trenholm agree to execute their joint and several bonds for the aggregate sum of fifteen hundred thousand dollars ($1,500,000) in favor of James Robb and Isaac Scott, of New York, and Charles T. Lowndes, of Charleston, as trustees, dated the first day of January, 1868; said bonds shall be issued of such denominations.as the trustees may require, and in four separate series. First. Three hundred and seventy-five thousand dollars ($375,000) payable on the first day of January, 1870. Second. Three hundred and seventy-five thousand dollars ($375,000) payable on the first day of January, 1871. Third. Three hundred and seventy-five thousand dollars ($375,000) payable on the first day of January, 1872. Fourth. Three hundred and seventy-five thousand dollars ($375,000) payable on the first day of January, 1873, with coupons attached, the first to become due on the first day of January, 1870, and the remainder on the first day of January in each year thereafter, at the rate of six per cent. per annum, and commencing on the first day of January, 1868.

"Theodore D. Wagner and William L. Trenholm agree to secure the payment of the aforesaid bonds by the execution to the aforesaid trustees of a mortgage on all the real estate belonging to themselves, John Fraser & Co., Charles K. Prioleau, John B. Lafitte and E. Lafitte & Co., upon which real estate there shall be a relinquishment or renunciation of dower, and which shall be free from all liens, except such as had been created and were existing on the twenty-second day of June, 1867 ; and the aforesaid Theodore D. Wagner and William L. Trenholm may at any time during the existence of said mortgage, sell any of the real estate mortgaged, with the advice and consent of said trustees, and upon such conditions as they may prescribe. The proceeds of such sale or sales shall be paid over to the trustees, and by them distributed *pro rata* among the holders of the joint and several bonds of Theodore D. Wagner and William L. Trenholm, as herein described, or in payment of arrears of interest coupons if at any time there be any past due and unpaid.

"3. Theodore D. Wagner and William L. Trenholm agree to execute bonds for the aggregate sum of seven hundred and ten thousand dollars ($710,000,) secured by a personal guarantee and endorsement, to be approved by the aforesaid trustees. Said bonds shall be issued in such denominations as the trustees may require, and in four separate series. First. One hundred and seventy-seven thousand five hundred dollars, ($177,500,) payable on the first day of January, 1870. Second. One hundred and seventy-seven thousand five hundred dollars ($177,500,) payable on the first day of January, 1871. Third. One hundred and seventy-seven thousand five hundred dollars ($177,500,) payable on the first day of January, 1872. Fourth. One hundred and seventy-seven thousand five hundred dollars ($177,500,) payable on the first day of January, 1873, with coupons attached, the first to become due on the first day of January, 1870, and the remainder on the first day of January in each year thereafter, at the rate of six per cent. per annum, commencing on the first day of January, 1868.

"4. The aforesaid bonds, in the aggregate, amounting to two millions two hundred and ten thousand dollars, ($2,210,000,) shall be executed immediately after the signing of these presents, and delivered to the aforesaid trustees for *pro rata* distribution among the creditors of John Fraser & Co., Fraser, Trenholm & Co., and Lafittes & LeCount, in settlement of their liabilities, as hereinafter provided.

" 5. The liabilities of the aforesaid firms, represented by sterling bills, accepted by Fraser, Trenholm & Co., Liverpool, shall be computed at seven dollars to the pound sterling, in lieu of principal, interest, damages and exchange, and subscribers to this agreement agree to surrender the aforesaid bills to Fielden Brothers & Co., of Liverpool, on or after the signing of these presents, with power to said firm to collect and receive all dividends to be made thereon by the inspectors of the estate of Fraser, Trenholm & Co., and shall pay over said dividends, when collected, to the holders of the aforesaid bills, or their representatives, to the extent of eight shillings in the pound sterling in reduction of said bills, and shall further pay over to the aforesaid trustees any excess of said dividends when collected, over and above eight shillings, who shall pay said excess to Theodore D. Wagner and William L. Trenholm.

" 6. Fielden Brothers & Co., of Liverpool, shall, on completion of the payment of eight shillings to the holders of acceptances of Fraser, Trenholm & Co., endorse the payment thereon and make a surrender of the acceptances aforesaid to the trustees named in this agreement, who shall, on the receipt thereof, immediately proceed to distribute *pro rata* among the holders of the aforesaid acceptances the bonds of Theodore D. Wagner and William L. Trenholm, as described in articles two and three.

" 7. Holders of non-accepted bills drawn on Fraser, Trenholm & Co., subscribers to this agreement, agree to surrender said bills to the trustees named in this agreement, and accept in payment thereof bonds of Theodore D. Wagner and William L. Trenholm, at seven dollars to the pound sterling, in lieu of principal, interest, damages and exchange of the amount of said bills, or any balance due on non-accepted bills drawn by John Fraser & Co., known as the bills of A. J. Ingersoll & Co.

" 8. Bills accepted by Fraser, Trenholm & Co., known as Ingersoll's bills, shall be entitled to receive payment in the bonds of Theodore D. Wagner and William L. Trenholm, for the balance due on said bills, after deductions are endorsed thereon for proceeds received for cotton surrendered by the inspectors of the estate of Fraser, Trenholm & Co., and sold for the benefit of said bills.

" 9. Creditors of John Fraser & Co., and not holders of foreign bills of exchange, subscribers to this agreement, shall file with the trustees evidence of indebtedness of said firm, and on the final distribution of the bonds of Theodore D. Wagner and William L.

Trenholm, as described in articles two and three, they shall be paid the amount of their claims in the aforesaid bonds *pro rata* with the holders of accepted and non-accepted foreign bills of exchange.

" 10. It is agreed, on the fulfillment of the conditions of this agreement, that the trustees shall surrender to Theodore D. Wagner and William L. Trenholm all bills of exchange drawn by John Fraser & Co., and Lafittes & LeCount, on Fraser, Trenholm & Co., and all evidence of indebtedness filed with them by the creditors of Fraser, Trenholm & Co., John Fraser & Co., and Lafittes & Le-Count.

" 11. It is further understood and agreed upon, that T. S. Metcalf, A. J. Ingersoll & Co., and Lafittes & LeCount, shall be bound to the creditors of John Fraser & Co., and Fraser, Trenholm & Co., by special guarantee on said bonds, in form to be approved by the aforesaid trustees, and to the amount respectively for which they are now severally bound on bills as drawers, endorsers or acceptors.

" 12. Subscribers to this agreement, creditors of John Fraser & Co., and Lafittes & LeCount, having incurred legal expenses in the prosecution of suits against the same, shall file with the trustees evidence of such expenses incurred and paid, for their approval, and the amount so approved shall become a charge on the common fund of dividend and bonds of Theodore D. Wagner and William L. Trenholm.

" 13. Subscribers to this agreement understand and agree that the claims of the government of the United States, made in certain proceedings in the Courts of the United States, and in the Courts of Great Britain, that certain moneys are owing and due by Fraser, Trenholm & Co., and John Fraser & Co., shall be ascer. tained in accordance with the stipulations of an agreement dated the twenty-fifth day of September, 1867, signed at Washington City, by Caleb Cushing and Isaac F. Redfield, on behalf of the government of the United States, and James B. Campbell and A. G. Magrath, on behalf of John Fraser & Co., and Fraser, Trenholm & Co., a copy of which is hereto annexed, is to be recognized as a debt due by said firms, and to be paid out of the bonds of Theodore D. Wagner and William L. Trenholm, hereby created for the benefit of the creditors, and with such priority and preference by law as the government of the United States can enforce.

" 14. And it is further agreed by the subscribers to this agreement, that Theodore D. Wagner shall, on the signing of these

presents, immediately proceed to England to bring about a speedy adjustment in accordance with the agreement hereto annexed and herein referred to.

"15. The binding effect of this agreement shall be preceded by the assent and signing of these presents by all the creditors of John Fraser & Co., Fraser, Trenholm & Co., and Lafittes and LeCount."

The bonds and mortgages provided for in the articles of the agreement, numbered 2, 3 and 4, were executed and delivered to the trustees therein named. Isaac Scott, one of the trustees, afterwards died, and these actions were brought against the two surviving trustees to establish the right of the plaintiffs as creditors of John Fraser & Co. to a share of the bonds.

On February 7th, 1872, the following order of reference was made :

"On motion of Buist & Buist, plaintiff's attorneys, and J. B. Campbell, of counsel, it is ordered that W. J. Gayer, Esq., be appointed Special Referee in these cases, with power to take testimony, summons and require the attendance of witnesses, and the production of books of account, papers and documents, necessary for the investigation hereby ordered.

"That the said Referee take an account of the debts of the late firm of John Fraser & Co., and of Fraser, Trenholm & Co., and Lafittes & LeCount, to whom due and owing, and the respective amounts thereof.

"That, for this purpose, he do cause to be published in the following gazettes, namely, in the Journal of Commerce of New York, and the Charleston Courier, and the Charleston Daily News, by weekly insertions, a notice, calling upon the creditors of John Fraser & Co., Fraser, Trenholm & Co., and Lafittes & LeCount, who may be minded to accept and become parties to the agreement of date 25th September, 1867, between Theodore D. Wagner and W. L. Trenholm, in behalf of John Fraser & Co., and of Fraser, Trenholm & Co., and the several creditors of either of said partnerships, and to receive the benefits, and give binding effect to the same, to appear before him at his office in Charleston, and after signifying their assent and signing said agreement, that they prove before him their alleged claims as creditors of either of said firms, before the first day of May, eighteen hundred and seventy-two.

"That as soon as possible thereafter the said Referee do make full report of the proceedings before him, stating the names of claim-

ing creditors and the amounts of their respective claims, and the proofs thereof, with his opinion thereon, respectively.

"That, for the purpose of this order, the said Charles T. Lowndes and James Robb do at once deposit with the said Referee the original agreement referred to.

"That the said Charles T. Lowndes and James Robb, in the meantime, and pending the reference and investigation hereinbefore provided, and until the further order of this Court, be restrained and enjoined from any further proceedings whatsoever under their assumed trust, except the careful preservation of the trust property in their possession, without transferring or disposing of any of the bonds executed by the said Theodore D. Wagner and W. L. Trenholm, under the aforesaid agreement, as well those secured by mortgage as those secured by personal guaranty of George A. Trenholm and James T. Welsman.

"And that the said Charles T. Lowndes and James Robb do forthwith account fully and minutely, and set forth all their doings and actings under their assumed trust.

"Finally, that any of the parties in interest under the said agreement have leave to move for such further order or orders as may appear to be necessary for the complete execution of this order."

The rest of the case will be understood from the report of the Referee and the exceptions thereto, the decree of the Circuit Court, and the opinion of this Court.

The report of the Referee is as follows:

These causes were referred to me, with directions, among other things, to take an exact account of the debts of the firm of John Fraser & Company, and of Fraser, Trenholm & Company, and of Lafittes and LeCount, to whom due and owing, and the respective amounts thereof, and to report the proofs thereof, with my opinion thereon, respectively.

I report that I have proceeded to execute the order, and the first claims before me were those of the plaintiffs in the two suits, namely, William A. Beall and Jeremiah Beall. They were taken up and examined together. They are identical, arising out of the same transaction. No other disputed claim has yet been reached or examined. The investigation of these has been full and exhaustive. At its close, the counsel on each side having agreed and fixed a day for a hearing on the report before your Honor, concurred in

the wish that I would report specially upon these claims. It is impossible to close my general report at this time, and my acquiescence will save the delay which otherwise would be unavoidable.

I therefore respectfully report the proofs in full, as taken before me in writing, on the claims of the plaintiffs, William A. Beall and Jeremiah Beall, which are appended hereto.

I further report briefly the opinions thereon which I have arrived at, upon full consideration of the testimony before me, as follows:

1st. I find these claims are for balances due on sales of cotton sold by Fraser, Trenholm & Company, on joint account of claimants and Thomas S. Metcalf, shipped to them by the latter, through John Fraser & Company.

2d. That Mr. Metcalf, in this joint account transaction, dealt with John Fraser & Company, and they dealt with him, as if and upon the assumption (which John Fraser & Company acquiesced in) that John Fraser & Company, and Fraser, Trenholm & Company were substantially the same—the former being the parent house, the latter a branch of it, and both only parts of one general concern or partnership, and each liable for the engagements of the other; all the capitalists were partners in each.

3d. That both John Fraser & Company, and Fraser, Trenholm & Company, were fully advised by Mr. Metcalf, and each house fully understood, that the plaintiffs and claimants, Messrs. Beall, were in joint interest with him in the cotton for which they now claim to be paid their shares of the sales money.

4th. That from the beginning, and all through, John Fraser & Company, as well as Fraser, Trenholm & Company, were liable, and whatever was due on these claims was always a debt of each and both of said firms.

5th. That Fraser, Trenholm & Company have been discharged in bankruptcy of their liability for said debts, and that the claimants have consented to their discharge, but did not, thereby, consent to the discharge of John Fraser & Company; but their consent was upon the express condition, well understood by the parties and by John Fraser & Company, that they should continue liable for such debts of Fraser, Trenholm & Company for which they were already liable, in which these debts are included. And the release of Fraser, Trenholm & Company by claimants does not, therefore, release John Fraser & Company.

6th. That the letter of John Fraser & Co., of January 15th, 1868, by which the balances due by them to each of the claimants are shown and acknowledged, though sufficient to establish their liability, unless controverted by more satisfactory evidence of error, inadvertence or mistake than any thing that has been produced or appeared before me, is not, in my opinion, the evidence of any new assumption, but of a well understood liability which to that time, and still later, had never been disputed or questioned.

7th. I therefore find and report that the plaintiffs, Messrs. Wm. A. Beall and Jeremiah Beall, are, as creditors of John Fraser & Company, entitled to prove for the amount of their claims, as set forth in the pleadings against defendants, Charles T. Lowndes and James Robb, trustees, under the memorandum of agreement made and entered into on the twenty-fifth day of November, 1867, by Theodore D. Wagner and William L. Trenholm, on behalf of John Fraser & Company, with their creditors.

8th. That the amount due to the plaintiff, William A. Beall, I find to be ninety-nine thousand six hundred and eighty-three dollars, and the amount due to the plaintiff, Jeremiah Beall, I find to be eighty-five thousand and one hundred and seventy-three dollars. These amounts are exclusive of interest, which is to be calculated on each amount from the eighteenth day of December, 1867.

9th. And I recommend that the defendants, Charles T. Lowndes and James Robb, transfer and deliver over to the said plaintiffs, in satisfaction of the said claims, and the interest due thereon, the proportionate share of the bonds of Theodore D. Wagner and William L. Trenholm, as well those secured by the mortgage of real estate transferred to them, the said trustees, as set forth in the pleadings, as those secured by personal guarantee and endorsement of James T. Welsman and George A. Trenholm, to which, as creditors of the said John Fraser & Company, they, the said William A. Beall and Jeremiah Beall, are of right entitled.

The defendants filed the following exceptions to the report:

1. Because the evidence in the case does not sustain the conclusion or opinion of the Referee, numbered 2 in his report, so far as that conclusion or opinion related to the house of John Fraser & Co. That no part of the evidence, except the statement of W. A. Beall, supports the conclusion or opinion that T. S. Metcalf dealt with John Fraser & Co., in relation to the cotton which is the sub-

ject of this litigation, as if and upon the assumption that John Fraser & Co., and Fraser, Trenholm & Co., were substantially the same. Nor is there any evidence that John Fraser & Co. "acquiesced in" this so-called "assumption." But, on the contrary, all the testimony before the Referee established the fact that Fraser, Trenholm & Co., and John Fraser & Co., were separate and distinct commercial firms; and no testimony whatever was given to shew that these two firms were parts of one general concern or partnership, and each liable for the engagements of the other.

2. Because, also, in the same conclusion or opinion of the Referee, numbered 2 in his report, he states that the claims in these cases are for balances due on sales of cotton sold by Fraser, Trenholm & Co., on joint account of the plaintiffs and Thomas S. Metcalf, and shipped to them, (Fraser, Trenholm & Co.,) through John Fraser & Co., when the papers produced show that no part of the cotton was shipped through John Fraser & Co., but all of it by T. S. Metcalf direct to Fraser, Trenholm & Co.

3. Because, whether John Fraser & Co. ever were or not advised of the interest of T. S. Metcalf, W. A. Beall and Jeremiah Beall in the cotton shipped on their account by T. S. Metcalf to Fraser, Trenholm & Co., they did not enter into any contract by which they were or could be made liable to T. S. Metcalf, or W. A. Beall or Jeremiah Beall for the said cotton or the proceeds thereof.

4. Because the Referee, in his conclusion or opinion, numbered four in his report, has stated that, from the beginning and all through, referring to the shipment of cotton to Fraser, Trenholm & Co. made by T. S. Metcalf on the joint account of himself and W. A. Beall and Jeremiah Beall, John Fraser & Co., as well as Fraser, Trenholm & Co., were liable, when such conclusion or opinion of the Referee is not sustained by any testimony before him.

5. Because the Referee, in the conclusion or opinion, numbered five in his report, should have reported that Fraser, Trenholm & Co. were discharged of the claim now made by the plaintiffs against John Fraser & Co., under the bankrupt laws of Great Britain; that such discharge freed the copartnership of Fraser, Trenholm & Co., and each member of the same, from any other or further liability for or because of the said claim; that no member of that firm admitted that, after such discharge, they, or either of them, should continue liable for the same; that John Fraser & Co. never in

any way were required or asked to be parties to any understanding connected with the assent of W. A. Beall or Jeremiah Beall to the discharge of Fraser, Trenholm & Co.; that if the firm of John Fraser & Co. has been liable to the plaintiffs for or because of the claim by them proved against Fraser, Trenholm & Co., the discharge of Fraser, Trenholm & Co. and the several partners of that firm would operate as the discharge of John Fraser & Co. That if such understanding had ever been made, it would have been void.

6. That the letter of John Fraser & Co., referred to in the conclusion or opinion numbered six in the report of the Referee, was proved to the Referee to have been written only for the purpose of communicating to the plaintiffs the statements and account, sent by Fraser, Trenholm & Co., to be forwarded to the plaintiffs, and that such statements and accounts were on their face statements or accounts of Fraser, Trenholm & Co., for which they were liable.

7. Because the Referee, in the conclusion or opinion numbered in his report six, at the close thereof, states that the liability of John Fraser & Co. for the claim made by the plaintiffs is a well understood liability of John Fraser & Co., which, at the time when their letter of the 15th January, 1868, was written to the plaintiffs, and till later, had never been disputed or questioned, when the evidence before him showed that no claim therefor was made until after the plaintiffs had become parties to the deed of inspectorship and discharged Fraser, Trenholm & Co. from all liability for the claim now made.

8. Because the Referee, in his conclusion or opinion, numbered seven in his report, states that, for the amounts which he sets forth as respectively due the plaintiffs, the plaintiffs are entitled to prove against the defendants, under the memorandum of agreement made and entered into on the 25th November, 1867, when the evidence before the Referee showed that the plaintiffs had never become parties to that agreement and were not entitled to claim any benefit or advantage therefrom.

9. Because the Referee should have reported—

1. That for the unpaid balance of the proceeds of cotton shipped by T. S. Metcalf on joint account of himself, W. A. Beall and Jeremiah Beall, to Fraser, Trenholm & Co., known as shipment No. 2, John Fraser & Co. were not liable, either as jointly with Fraser, Trenholm & Co., or in any other mode.

2. That if John Fraser & Co. had been so liable to the plaintiffs, they were discharged therefrom by the operation of the bankrupt laws of Great Britain.

3. That if such discharge was alleged to be not final as to them, because of any understanding or agreement that it should not be so, the Referee should have reported that there was no evidence which connected John Fraser & Co. with any such understanding. Next, that no person was authorized to affect them by any consent to such understanding. Next, that such understanding, if proved, which it was not, was void.

4. That the memorandum of agreement of the 25th November, 1867, plainly expressed the manner in which creditors of John Fraser & Co. entitled to become parties thereto should make proof of their intent. That the plaintiffs in this case had not only never become parties to the same, but had, in contemplation of law, refused to become parties to the same; and, therefore, under such circumstances, these plaintiffs could have no claim against the defendants for any share or portion of the securities held by them in trust for those who are or were parties to that agreement.

The decree of His Honor the Circuit Judge is as follows:

GRAHAM, J. The plaintiffs claim to be creditors of John Fraser & Company, and they bring suit to obtain their proportionate share of certain bonds of Theodore D. Wagner and William L. Trenholm, which are held by the defendants in trust "for *pro rata* distribution among the creditors of John Fraser & Company, Fraser, Trenholm & Company, and Lafittes & LeCount, in settlement of their liabilities," as provided by agreement "between Theodore D. Wagner and William L. Trenholm, in behalf of John Fraser & Company, and Fraser, Trenholm & Company, and the creditors of either or both of said partnerships," bearing date the twenty-fifth day of November, eighteen hundred and sixty-seven. The defendants resist this claim.

The cases came on to a hearing on the report of W. J. Gayer, Esq., Special Referee, and exceptions thereto by the defendants.

The Referee reports the proof taken before him in writing, and further reports, pursuant to the order of reference, the opinions he has arrived at thereon.

I will take up these opinions, with the exceptions to each, in their order, and thus dispose of them separately:

The Referee says : " 1st. I find these claims are for balances due on sales of cotton sold by Fraser, Trenholm & Company on joint account of claimants and Thomas S. Metcalf, shipped to them by the latter, through John Fraser & Company." The defendants except to this, and say : " The papers produced show that no part of the cotton was shipped through John Fraser & Company, but all of it by T. S. Metcalf, direct to Fraser, Trenholm and Company."

If the Referee is to be understood as meaning that the cottons were sent to Charleston and delivered into the actual possession of John Fraser & Company, and then put on shipboard, and the bills of lading taken by them, then he is mistaken, and the exception is well taken. But I do not so understand him. The letter of Mr. Metcalf of January 31st, 1866, the answer of John Fraser & Company of February 3d, 1866, and the subsequent correspondence, give a clear view of the transaction. John Fraser & Company advise Metcalf to ship the cottons himself, take the bills of lading to order, and that they will make the advances, and " *hold the cotton* subject to his order of sale." They would prefer, they say, "not to draw any bills themselves, but to send the bills of lading over to Fraser, Trenholm & Company, and let them send him (Metcalf) marginal credits." Their suggestion seems to have been adopted as to the manner of shipping the cotton from Savannah and other points, and the bills of lading appear to have been forwarded to John Fraser & Company, thus enabling them to " hold the cotton subject to Metcalf's order of sale." Their preference not to draw, themselves, for advances, was not adopted, and their bills were issued and sent to Metcalf in very large amounts. I understand the Referee to mean these transactions when he speaks of the cotton being shipped through John Fraser & Company, and not its manual handling and putting on shipboard. I agree with him, and the exception is overruled.

The Referee next says: " 2d. That Mr. Metcalf, in this joint account transaction, dealt with John Fraser & Company, and they dealt with him, as if and upon the assumption (which John Fraser & Company acquiesced in) that John Fraser & Company, and Fraser, Trenholm & Company, were substantially the same, the former being the parent house, the latter a branch of it, and both only parts of one general concern or partnership, and each liable for the engagements of the other ; all the capitalists were partners in

each." To this the defendants except, as follows: "1. Because the evidence in the case does not sustain the conclusion or opinion of the Referee, numbered 2 in his report, so far as that conclusion or opinion relates to the house of John Fraser & Company. That no part of the evidence, except the statement of W. A. Beall, supports the conclusion or opinion that T. S. Metcalf dealt with John Fraser & Company in relation to the cotton which is the subject of this litigation, 'as if, and upon the assumption that John Fraser & Company, and Fraser, Trenholm & Company were substantially the same.' Nor is there any evidence that John Fraser & Company. 'acquiesced in' this so-called 'assumption.' But, on the contrary, all the testimony before the Referee established the fact that Fraser, Trenholm & Company, and John Fraser & Company were separate and distinct commercial firms. And no testimony whatever was given to show that these two firms were parts of one general concern or partnership, and each liable for the engagements of the other."

I think there is sufficient evidence besides W. A. Beall's statement to support the conclusion of the Referee, not only that Mr. Metcalf, but also the plaintiffs, through him, did deal with John Fraser & Company as if they and Fraser, Trenholm & Company were substantially the same, and that John Fraser & Company did acquiesce in, if not encourage, this assumption.

Their letter of February 3d, 1866, and the whole subsequent history of their dealings, culminating in charging themselves with the balances of December 18th, 1867, as per letter of January 15th, 1868, in my view, warrant the Referee's conclusion. He does not say, nor does the Court so understand him, that, as matter of law or of fact, these two firms were parts of one general concern or partnership, each liable for the engagements of the other. He only says that Mr. Metcalf dealt with John Fraser and Company as if this was so, and they acquiesced in this manner of dealing, and I think the testimony fully warrants this statement.

The Referee next finds: "3d. That both John Fraser and Company, and Fraser, Trenholm & Company, were fully advised by Mr. Metcalf, and each house fully understood, that the plaintiffs and claimants, Messrs. Beall, were in joint interest with him in the cotton for which they now claim to be paid their shares of the sales money." I do not find that this conclusion is excepted to, but, instead, the defendants say: "Whether John Fraser & Co. were or were not

advised of the interest of T. S. Metcalf, W. A. Beall and Jeremiah Beall in the cotton shipped on their account by T. S. Metcalf to Fraser, Trenholm & Co., they did not enter into any contract by which they were or could be made liable to T. S. Metcalf, or W. A. Beall, or Jeremiah Beall, for the said cotton, or the proceeds thereof."

My recollection is that counsel for defendant admitted the correctness of this finding. In the pleadings, however, the defendants greatly rely upon the alleged fact that Mr. Metcalf did not discover to John Fraser & Co. the joint ownership of the plaintiffs, and John Fraser & Co., in their letter to W. A. Beall of June 24th, 1870, allege "entire ignorance of plaintiff's joint interest." "There was nothing," they say, "said of it in the invoices or letters received from Mr. Metcalf, and they believed that all of his shipments, amounting to forty-five thousand and thirty-two bales (the six thousand three hundred and fourteen bales included) to be his own, except the single lot of eleven hundred and three bales, which the invoice expressed to be on account of Mr. Metcalf and yourself" (W. A. Beall); and they claim that, in consequence of this ignorance, they advanced to Mr. Metcalf, as if it was his own, and allege a loss thereby of some forty-four thousand pounds sterling. John Fraser & Co., and the defendants, relying upon them, were mistaken in all this, and the mistake was shown by the production of Mr. Metcalf's letters to them and their answers before and during and after the shipment.

The next finding is as follows:

"4th. That from the beginning, and all through, John Fraser & Co., as well as Fraser, Trenholm & Co., were liable, and whatever was due on these claims was always a debt of each and both of said firms."

To this the defendants say:

"Fourthly. Such conclusion or opinion of the Referee is not sustained by any testimony before him."

I do not agree with the defendants that the conclusion of the Referee is unsustained by "any testimony." On the contrary, the general current of testimony, and the defenses furnished by John Fraser & Co., to the defendants, and by them set up, namely, the alleged "entire ignorance" of the joint interest of the plaintiffs, the

alleged over-payment to Mr. Metcalf in consequence, the claim of release to John Fraser & Co., by taking dividend and release of Fraser, Trenholm & Co. in bankruptcy, impress my mind as circumstances greatly in support of the Referee's conclusion. The whole testimony of every kind, the correspondence, the conduct of all the parties, the pleadings, the terms of the agreement of November 25th, 1867, and the statements of different witnesses, confirm the same impression, and I am constrained to the same conclusion as the Referee. Add to these the letter of January 15th, 1868, wherein John Fraser & Co. admit the balances due by them, and the claims of plaintiffs seem to be established. In my opinion, John Fraser & Co. have been, and are clearly, liable to plaintiffs, as if they had drawn their bills for the same amount on Fraser, Trenholm & Co. and they were unpaid or unaccepted.

The fifth finding of the Referee is as follows:

"5th. That Fraser, Trenholm & Co. have been discharged in bankruptcy of their liability for said debts, and that the claimants have consented to their discharge, but did not thereby consent to the discharge of John Fraser & Co.; but their consent was upon the express condition, well understood by the parties and by John Fraser & Co., that they should continue liable for such debts of Fraser, Trenholm & Co. for which they were already liable, in which these debts are included. And the release of Fraser, Trenholm & Company by claimants does not, therefore, release John Fraser & Co."

To this the defendants make the following exceptions:

"Fifth. Because the Referee, in the conclusion or opinion numbered five in his report, should have reported that Fraser, Trenholm & Co. were discharged of the claim now made by the plaintiffs against John Fraser & Co., under the bankrupt laws of Great Britain; that such discharge freed the copartnership of Fraser, Trenholm & Co., and each member of the same, from any other or further liability for or because of said claim; that no member of that firm admitted that, after such discharge, they, or either of them, should continue liable for the same; that John Fraser & Co. never, in any way, were required or asked to be parties to any understanding connected with the assent of W. A. Beall or Jeremiah Beall to the discharge of Fraser, Trenholm & Co.; that if the

firm of John Fraser & Co. had been liable to the plaintiffs for or because of the claim by them proved against Fraser, Trenholm & Co., the discharge of Fraser, Trenholm & Co., and the several partners of that firm, would operate as a discharge of John Fraser & Co.; that if such understanding had ever been made it would have been void."

The ground of defence here taken was exhaustively discussed in behalf of defendants. There seems to be no reasonable doubt that the plaintiffs, in becoming parties to the deed of inspectorship, proving in bankruptcy and taking dividends, did understand that they did not thereby release John Fraser & Co. They were so advised by the English lawyers, counsel for the bankrupts, and also by their own counsel. They relied upon these opinions, which are now in evidence by the testimony of Mr. Squarey, Mr. Hill and Messrs. Hull, Stone and Fletcher, the solicitors of Fraser, Trenholm & Co. The latter, advising John Fraser & Co. as to the effect of plaintiffs' signing the deed of inspectorship, say it " has not in any way prejudiced their [plaintiffs'] right of proof against your [John Fraser & Co.'s] estate." And again, a year later, writing to Mr. Prioleau, they say : " It seems to us that the defense simply is that John Fraser & Co. never owed the money." If it were necessary for me to adjudge this point, I should not feel at liberty to disregard this testimony. But, in my view, the parties have settled that question for themselves. This is not a suit to make John Fraser & Co., or the parties personally liable for the debt upon which Fraser, Trenholm & Co. have paid a dividend and been discharged, but to obtain the *pro rata* share of a fund held in trust for persons coming within a particular description ; and the question is, do the plaintiffs come within that description—are they creditors of John Fraser & Co., Fraser, Trenholm & Co., or Lafittes & LeCount, and, if so, can the trustees, considering the terms of their trust, raise the objection that taking a dividend from the estate of Fraser, Trenholm & Co. precludes the party from taking his proportionate share of the fund? I have already expressed my judgment that plaintiffs *are* creditors of John Fraser & Co., and the terms of the trust sufficiently answer the remainder of the question.

The agreement of November 25th, 1867, fourteen days after the date of the deed of inspectorship, but several months after the assent of plaintiffs to the " proposed " deed, contemplates through-

out that parties having claims upon Fraser, Trenholm & Company, upon which John Fraser & Company are also liable, shall prove against the former estate and take their dividends. The amount of the dividend is even estimated at eight shillings to the pound, and if it should exceed that rate the surplus is to be paid to Wagner and Trenholm, who put up the fund. The plain meaning of the agreement as to debts, on which both firms were liable, is, that the fund is to pay twelve shillings in the pound, and the estate of Fraser, Trenholm & Co. was expected to pay the remaining eight shillings, and if it paid more, then the surplus to be paid to Wagner and Trenholm. It seems to have turned out that there was no surplus, but a deficiency; and additional bonds were created to make good the eight shillings. How, then, can the trustees of this fund set up the pretence that taking a dividend from Fraser, Trenholm & Co. excludes a party, not from payment by John Fraser & Co., but from this fund created by two individuals for the expressed purpose to be distributed among such persons and others?

The release of Fraser, Trenholm & Co. does not exclude the plaintiffs from their right to a ratable share of the bonds held in trust for them by defendants.

The legal effect of plaintiffs' accession to the deed of inspectorship and proof against the bankrupt estate in England, it was urged, is that the plaintiffs, notwithstanding the testimony of the English lawyers to the contrary, are excluded from proving also against John Fraser & Co. The authority of adjudicated cases in the English Courts was cited and relied upon. It does not appear to this Court necessary to decide any such questions in this case, because the questions here raised are not the same. It is not questioned that Wagner and Trenholm had a right to make the provision they have done for the payment of the debts of John Fraser & Co. which have already been in part paid by Fraser, Trenholm & Co., and this they have done. It is the duty of the trustees to execute the trust with which they are charged, and not their duty to seek to defeat it against parties coming within the description of those intended to be provided for by it. They have a right to make the defense suggested by the English lawyers of the bankrupt house, namely: "Simply, that John Fraser & Co. never owed the money." This they have done. In the judgment of this Court, they have failed to establish that defense, and their duty is accomplished. The question is one of fact and of testimony.

The sixth conclusion of the Referee is as follows :

" 6th. That the letter of John Fraser & Co., of January 15th, 1868, by which the balances due by them, to each of the claimants, are shown and ·acknowledged, though sufficient to establish their liability, unless controverted by more satisfactory evidence of error, inadvertence or mistake, than anything that has been produced or appeared before me, is not, in my opinion, the evidence of any new assumption, but of a well understood liability, which, to that time and still later, had never been disputed or questioned." To this defendants except, and their objections are marked 6 and 7, as follows : " 6. That the letter of John Fraser & Co., referred to in the conclusion or opinion numbered 6, in the report of the Referee, was proved to the Referee to have been written only for the purpose of communicating to the plaintiffs the statement and accounts sent by Fraser, Trenholm & Co., to be forwarded to the plaintiffs. And that such statements and accounts were, on their face, statements or accounts of Fraser, Trenholm & Co., for which they are liable. 7. Because the Referee, in the conclusion of opinion numbered 6, in his report, at the close thereof, stated that the liability of John Fraser & Co., (for the claim made by the plaintiffs) is a well understood liability of John Fraser & Co., which at the time when their letter of the fifteenth day of January, eighteen hundred and sixty-eight, was written to the plaintiffs, and till later, had never been disputed or questioned, when the evidence before him showed him that no claim therefor was made until after the plaintiffs had become parties to the deed of inspectorship, and discharged Fraser, Trenholm & Co. from all liability for the claim now made."

An effort was made to break the effect of the letter of which the Referee speaks. Mr. Fanning, the partner in John Fraser & Company, who wrote that letter, was examined, but he failed to say that it does not mean just what it purports by its language, namely : that balances shown by accounts of Fraser, Trenholm & Company were also balances due by John Fraser & Company. If the facts were as stated by defendants' exception, that no actual formal demand was ever made by plaintiffs upon John Fraser & Company, till after they (plaintiffs) had become parties to the deed of inspectorship, I do not see that it would be inconsistent with the conclusion of the Referee that the liability " was well understood and had never been disputed or questioned." The plaintiffs certainly

did, in Liverpool, before assenting to the proposed deed of inspector-
ship, let it be known what they then thought of the liability of
John Fraser & Company. Mr. W. A. Beall testifies that "after
his return from Liverpool, John Fraser & Company never denied
his and his brother's claim against them for the balance. They
only set up" (and that was in his last interview with Mr. Wagner)
that the "signing of the deed of inspectorship in Liverpool *released*
the firm of John Fraser & Company in Charleston." "I saw," he
says, "Mr. Wagner in reference to these. claims, after my return,
two or three times, besides urging the house here to a settlement of
these claims by letters." This testimony of Mr. Beall is, I think,
fortified by circumstances, and, if true, is conclusive. John Fraser
& Company were not *released* from this debt if they were never
liable for it, and if, *when urged to a settlement,* they set up a
"*release,*" but did not deny and say "*simply, they never owed the
money,*" the conclusion is not an extravagant one that the "liability
was well understood and not disputed or questioned."

The seventh and eighth findings of the Referee state the respective
amounts of the respective claims of plaintiffs. No error is claimed
in the calculations, and they are therefore confirmed. But the
defendants make this exception: "8. Because the Referee, in his
conclusion or opinion, numbered 7 in his report, states that, for the
amounts which he sets forth as respectively due the plaintiffs, the
plaintiffs are entitled to prove against the defendants under the
memorandum of agreement made and entered into on the 25th
November, 1867, when the evidence before the Referee showed that
the plaintiffs had never become parties to that agreement, and
were not entitled to claim any benefit or advantage therefrom.

It is very clear that the plaintiffs cannot have the benefit of the
agreement of November 25th, 1867, without becoming parties to it.
The order of reference directs the Referee to call in the creditors of
John Fraser & Company, Fraser, Trenholm & Company, and
Lafittes & LeCount, "*who may be minded* to accept and become
parties to the agreement of date November 25th, 1867," &c.. &c.
The plaintiffs have come in under this call, and the report is made
thereupon. There is also this provision in the order, to wit: "That,
for the purpose of this order, the said Charles T. Lowndes and
James Robb do at once deposit with the said Referee the original
agreement referred to." It does not appear that they have yet
obeyed this order, and, while that obedience is delayed, it is too

soon for the delinquents to complain that any creditor who has proved his claim, because "minded to become a party," has not yet done so. There is no limit of time fixed by the deed itself for the parties to come in, and the Trustees admit they have ample funds still undivided. The Court cannot think this objection seriously relied upon.

I am of opinon that the conclusions set forth by the said Referee are sustained by the evidence and the law applicable to the case.

It is, therefore, ordered and adjudged that the exceptions to the said report be overruled, and that the said report stand confirmed in all respects as the judgment of the Court.

It is further ordered that the defendants, Charles T. Lowndes and James Robb, do admit the plaintiffs, W. A. Beall and Jeremiah Beall, to become parties to the agreement of November 25th, 1867, on an equal footing with the holders of accepted and non-accepted foreign bills of exchange, and to be paid out of the bonds constituting their trust, in the same proportion, *pro rata*, namely: To the plaintiff, William A. Beall, or his attorney, bonds to the amount of ninety-nine thousand six hundred and eighty-three ($99,683) dollars, exclusive of interest; and to the plaintiff, Jeremiah Beall, or his attorney, to the amount of eighty-five thousand one hundred and seventy-three ($85,173) dollars, exclusive of interest.

It is further ordered that the plaintiffs, or either of them, have leave to apply for any further order which may be necessary to enable them to carry into full effect this decree.

The defendants appealed on the grounds:

1. That there was no evidence in the case to establish any contract, understanding or agreement, by which John Fraser & Company became or were liable to the plaintiffs for the acts of Fraser, Trenholm & Company.

2. That the evidence in the case did establish the fact that Fraser, Trenholm & Company, and John Fraser & Company, although some of the partners in the one were also partners in the other firm, were distinct firms, each having one or more persons, not partners in the other, and neither bound for the acts of the other, unless by some express contract or agreement.

3. That the evidence in the case did establish the claim of the plaintiffs, as a claim against Fraser, Trenholm & Co., for which John Fraser & Co. were in no manner liable.

4. That if John Fraser & Co. were or had been liable for the claim made in the pleadings, the same had been discharged by the assent of the plaintiffs to the deed of inspectorship in England, under the Bankrupt Act of 1861, in that country.

5. That the claim of the plaintiffs made in this case against John Fraser & Co. was the same which had been made in England, under the Bankrupt Act of 1861, against the bankrupt estate of Fraser, Trenholm & Co., and that, for the claim so made against that bankrupt estate, the plaintiffs had received their dividends. That the plaintiffs, by their assent to the deed of inspectorship in England, under the English Bankrupt Act of 1861, and the receipt of dividends from the bankrupt estate of Fraser, Trenholm & Co., made their election to become the creditors of Fraser, Trenholm & Co., and discharged the said copartnership of Fraser, Trenholm & Co., and all the individuals composing the same, among whom were two or more persons partners of John Fraser & Co.; that the claims so made against Fraser, Trenholm & Co., discharged the said claims against all persons, except third parties, in which class of persons none could be regarded who were parties to the deed of inspectorship; that if John Fraser & Co. had ever been liable to the plaintiffs for the claim made by them against the bankrupt estate of Fraser, Trenholm & Co., the proof of such claim and the receiving dividends from the bankrupt estate of Fraser, Trenholm & Co., forever discharged all persons from the said claim who had been liable as partners of Fraser, Trenholm & Co., and that to make any other copartnership liable, in which were two or more of those who composed the copartnership of Fraser, Trenholm & Co., is in violation of the deed of inspectorship, and forbidden by the English Bankrupt Act of 1861.

6. That whatever understanding or agreement, if any, was had or made when the plaintiffs became parties to the Deed of Inspectorship, was without the presence, assent or privity of John Fraser & Co.; that even if the same might be sufficient to affect the validity of the assent made and given to the deed of inspectorship, yet while that assent is unrevoked and under it the plaintiffs are in the possession of dividends received by them in consequence of such assent, the plaintiffs cannot at once take the benefit of such assent and renounce the obligations which it imposes on them by setting up some understanding or agreement by which the legal operation and effect of such assent is avoided, so far as John Fraser & Co. are concerned.

7. That when the claim of the plaintiffs against Fraser, Trenholm & Co. was discharged, by the assent to the deed of inspectorship and the acceptance of dividends from the bankrupt estate of Fraser, Trenholm & Co., and as such ceased to be a claim against John Fraser & Co., such claim was no longer a claim to be protected under the memorandum of agreement of the 25th November, 1867.

8. That the decree in the case accepts it as a fact that the claim now made by the plaintiffs is within the terms and the intent and meaning of the agreement of the 25th November, 1867, and of Theodore D. Wagner and William L. Trenholm, the parties by whom the said agreement was made, when both of these parties testified that they did not intend or desire by that agreement that the plaintiffs should be entitled to any benefit resulting therefrom ; and although the intent and desire to exclude a party, if a creditor, may be a question which affects or not, as the case may be, the validity of the agreement, yet such intent and desire will not admit the party or parties intended to be excluded to claim that relation between them and the trustees named in the agreement that does exist between the trustees and the parties who are entitled to the benefit of the said defendant.

9. That the decree admits the plaintiffs to all the benefits of the said agreement when the plaintiffs testify that they had not intended to accept the same, and when it was in evidence that, subsequent to the filing of their complaint, they had instituted proceedings at law against John Fraser & Co. for the recovery of the claim now made in these proceedings against the trustees; and that such proceedings were and are the accepted evidence in law of a refusal to be parties to the said agreement.

*B. F. Dunkin, Magrath & Lowndes,* for appellants.

*Buist & Buist, Campbell, T. Y. Simons,* contra.

April 30, 1873. The opinion of the Court was delivered by

Moses, C. J. Whether the firm of John Fraser & Company, or that of Fraser, Trenholm & Company, was responsible to the respondents by reason of any joint interest or ownership in the cotton referred to in the evidence as shipped by Metcalf, it is scarcely necessary now to consider.

Whatever doubts might have existed in regard to it have been removed by the admission of the appellants in their ninth ground

of appeal, and the recognition, on the part of both of the firms, of the ownership of the respondents in a certain amount of the cotton by the letter of Fraser, Trenholm & Company, of 21st December, 1867, to John Fraser & Company, and of the latter to W. A. Beall, of January 15, 1868. The actual amounts respectively due to the respondents for their several interests in the Metcalf shipment are therein stated. Whatever obligations were imposed on the one firm or the other, or on both, as to Metcalf, if he had been the sole owner and had pursued, in relation to it, the same course these respondents observed, must attach in their favor. Regarding it, then, as an established fact that the respondents had each an interest in the cotton amounting at least to the balance due, stated in the said letters, the material inquiry is whether they can claim the provisions of the agreement of 25th November, 1867, either as creditors of the firm of John Fraser & Company, or of Fraser, Trenholm & Company. Although the extent of the share which each of the respondents had in the cotton may not have been known to John Fraser & Company until about the 1st of January, 1868, still the evidence clearly shows that as early as the date of the first shipment it was brought to the notice of both the firms that a portion of it was on joint account with the Bealls, and the mode of distinguishing the cottons, as between the respective parties, made known.

If the respondents can bring themselves within the terms of the instrument by showing that a trust is created for their benefit, the execution of which they can require of these appellants, they are not to be deprived of the right to its enjoyment because the exact amount of their claim may not have been known, at the date of the agreement, to the parties who made it. If, before the trust fund is exhausted, they can show that they are entitled to a participation in it by fulfilling any of the conditions by virtue of which the trust is to attach, they have the right to enforce it.

It will relieve the case of some embarrassment and the Court of much unnecessary labor by declaring at once that if the claims of the respondents depend on any provisions in the agreement by which they are entitled to the relief they ask as creditors of Fraser, Trenholm & Co., they must fail. They are not within the class of creditors provided for on account of liabilities represented by sterling bills accepted by Fraser, Trenholm & Co., nor are they holders of non-accepted bills drawn on Fraser, Trenholm & Co., referred to in the seventh clause. If they cannot sustain their right under the

ninth clause of the agreement as creditors of John Fraser & Co., they are precluded.

The agreement is by Theodore D. Wagner and William L. Trenholm, in behalf of John Fraser & Co., and of Fraser, Trenholm & Co., and the creditors of either or both of the said copartnerships. It cannot be said that they compose but one house, as the members of the two firms are not the same, and that incident so necessary to establish exact and complete identity between them is wanting.   A partnership as to third persons may arise by operation of law. Two several firms may, by their course of dealing with a third person in the same transaction, incur a joint liability, in the same manner and to the same extent that two or more individuals may. In fact, though the firms may be separate, yet, if they both hold out that they are one, each is liable to answer for any obligation they incur to a party dealing with them under such circumstances. Should one do acts, no matter of what nature, to induce others to believe him a partner with another, he will be so held, and the same principle must apply where two firms, by their acts and representations, create a belief upon the faith and credit of which dealings are had with them.   As was said by Parke, J., in *Dickinson* vs. *Valby*, 10 B. & C., 128: "The defendant would be bound by an indirect representation to the plaintiff, arising from his conduct, as much as if he had stated to him directly and in express terms that he was a partner, and the plaintiff had acted upon that statement."

So far from finding the conclusion of the Referee and the presiding Judge on this question of fact, as to the relation between these houses in the transaction, which is the subject of the complaint, manifestly against the evidence, a full examination of it leads us to the same result.   Confining our enquiry alone to the letters between the parties, what do we find ?   In the first letter of Metcalf to John Fraser & Co., January 31, 1866, he says :

" GENTS—How stands your firm, (Fraser, Trenholm & Co.,) at Liverpool?" to which John Fraser & Co. reply, on the 3d February following : " It gave us sincere pleasure to receive your letter of the 31st ult., proposing to ship your cotton to your old friends, Fraser, Trenholm & Co. * * * * We will tell you fully how we are situated, and let you determine for yourself, and for us too, whether we shall have the benefit of your patronage on this occasion. * * * * The business we will transact for you on the old terms, which we hope will be satisfactory, and we will make the advance you

name, and hold the cotton subject to your order of sale as suggested." Metcalf, on March 31, 1866, writes to John Fraser & Co.: "I enclose you my letter to your Liverpool house, which please forward;" to which they reply on 2d April, 1866 : " The enclosure for our Liverpool house will be forwarded by the first mail." The said letter, so enclosed for Fraser, Trenholm & Co., of the same date, says : "I shall have the bills of lading filled up to order and sent you through your house in Charleston." The various letters offered in evidence, beginning at page 41 of the brief, lead unerringly to the conclusion that the transaction, so far as the owners of the cotton were concerned, was founded on the belief arising from the conduct of both the firms, that the dealing was with parties having some general and connecting interest in their commercial relations.

The claim of the respondents cannot be defeated by the operation and effect of the proceedings in England under the bankrupt law. However well established may be the principle contended for in the argument in regard to double proof against several trading firms where there are persons who are parties to them all, and its enforcement in England, it can have no application in the case before us. So far as the bonds for the $1,500,000 provided by the agreement as a fund to meet the trust was to avail, it is not unreasonable at least to say that their value depended on the mortgage " of all the real estate of the said Wagner, W. L. Trenholm, John Fraser & Co., C. K. Prioleau, John B. Lafitte and E. Lafitte & Co.," which was given to secure their payment. The agreement was executed only fourteen days after the deed of inspectorship.

It is not necessary to enquire how far the proceedings in bankruptcy of a foreign Court will conclude another jurisdiction.— *Assignees of Tapham* vs. *Chapman et al.*, 1 Mill., 283 ; *Robinson* vs. *Crowder, Clough & Co.*, 4 McC., 519; *Ogden* vs. *Sanders*, 12 Wheat., 211. Could the proceedings in bankruptcy in England affect the interest of Wagner, W. L. Trenholm, Prioleau, in the real estate which they held in South Carolina? If so, how could it be "free from all liens except such as had been created and were existing on the 22d of June, 1867," as provided by the agreement? "All the authorities in both countries, so far as they go, recognize the principle, in its fullest import, that real estate or immovable property is exclusively subject to the laws of the government within whose territory it is situate. So that we may here fully adopt the language of John Vœt : " *De realibus quidam cum*

*plerorumque consen-sus sit, id pluribus docere supervacuum fuerit;*" indeed, so firmly is this principle established that in cases in bankruptcy, the real estate of the bankrupt situate in foreign countries is universally admitted not to pass under the assignment, although, as we have seen, there are great diversities of opinion as to movables."— Story Conflict of Laws, § 428.

There is nothing in the agreement to warrant an inference that any of the creditors of John Fraser & Co. were to be excluded from its benefits. It was an honest and earnest endeavor to provide, if possible, for all the demands which existed against the firm of John Fraser & Co., which had not gone into bankruptcy, in aid of the assets which may have been transferred in England by Fraser, Trenholm & Co., to provide an additional fund for their creditors of a certain class, which would leave a larger sum for those who could not be embraced within it. If, however, the words of the agreement, by the description of the parties who are to be entitled to its benefit, are to be accepted in their usually received significance, these respondents may well insist on being included among those provided for by the ninth clause. They are creditors of John Fraser & Co., whose whole real estate is pledged by the agreement to the payment of the various liabilities embraced in it.

The deed of inspectorship, and the assent of the respondents, in favor of Fraser, Trenholm & Co., cannot extend to John Fraser & Co., who are not parties to it. The effect of the deed, as to this firm, preserves the rights of its creditors in whose favor there is a joint liability with Fraser, Trenholm & Co., by the following provision, found on page 204 of the brief: "These presents shall not prejudice or affect the rights or remedies of any of the said creditors against any surety or sureties, or any person or persons who may be jointly liable with the said debtors for any of the said debts, or generally any person or persons other than the said debtors, or their respective heirs, executors or administrators ; and, for the sake of conformity alone, the said debtors, or any of them, or their or any of their heirs, executors or administrators, may be joined in any actions, suits or other proceedings to be brought or instituted by any of the said creditors against such surety or sureties, or other person or persons." In this connection, the reservation in the assent of the respondents to the deed may well be held to refer to the firm of John Fraser & Co. as the third parties against whom their rights and remedies were to be preserved. The mean-

ing to be applied to a word in an instrument of this kind should not be of an over critical character. What Beall intended by the use of the term " third parties " must be sought in the purposes which the deed of inspectorship proposed and the effect he supposed it was to have in relation to the debt which he claimed against both of the firms.

Who possibly can be comprehended within the words but the concern of John Fraser & Co. ? With what other person or persons has any connection with the debt been intimated ? That this was the designation he had in view may the more readily be accepted from the whole tenor of the evidence in regard to the declaration of assent.

None of the proceedings in bankruptcy are before us save the deed. Looking to this as the standard by which the rights and obligations of the party debtors to it are to be measured and regulated at the date of the agreement, they were not released from the liabilities of Fraser, Trenholm & Company, and, therefore, neither Wagner nor W. L. Trenholm can claim any discharge which would acquit them of the debt established in favor of the respondents.

By the terms of the deed (brief, p. 205,) " the said creditors do for themselves respectively, and their respective heirs, executors and administrators, covenant with the said debtors, and each and every of them, their and each and every of their executors and administrators, that if and when the said inspectors or inspector shall, by writing under their or his hands, certify that the winding up, realization and liquidation provided for by these presents has, as far as possible, been concluded, then, and in such case, and immediately upon such certificate being given, the said debtors and each, et ct., and their estates and effects, shall be thenceforth absolutely released and discharged from the said debts due from them to the said creditors respectively, and these presents shall thenceforth operate as a defeasance pleadable in bar," et ct. It has not been shown that any such certificate had been given, and from the short period which elapsed between the date of the deed and the agreement it was almost impossible that in the meantime a business of the magnitude of that which had been carried on by so extensive a concern could have been wound up, realized and liquidated.

It is contended no such relation as that of *trustee and cestui que trust* exists between the appellants and the respondents, and that

the latter are not entitled to the benefit of the agreement, because it was not intended for them by those who made it, and their position has been inconsistent with its acceptance. The trust here cannot be considered a purely voluntary one; it was for the benefit of creditors, and however contradictory the decisions may be as to the power of revocation on the part of one who has made a voluntary settlement, if there was a consideration moving it, no power of revocation is retained. The debts of the creditors provided for by the assignment here constitute a sufficient consideration.

The question is not between conflicting creditors. It is really, through the trustees, between the parties creating the trust, and creditors who claim that they are entitled by virtue of a certain provision in the agreement covering their debts. The fund is in Court ample to meet the demands of all the creditors who have appeared under the order of February 7, 1872, the effect of which is to marshal the trust securities, and wind up the trust by a final execution of it.

While the binding effect of the agreement was to be preceded by the assent and signing of all the creditors of John Fraser & Co., Fraser, Trenholm & Co., and Lafittes & LeCount, no time was limited in which the one was to be given and the other done.

Creditors who were before the Court are supposed and held to have conformed to all the conditions and requirements of the agreement, to as full an extent as if they had expressed their assent in writing. " Declarations of the intention or understanding of a grantor, different from the intent apparent on the face of a deed, must be made at the time of executing it."—*Louverly and Wife* vs. *Arden et al.*, 1 S. C., 240. The bonds of Wagner and W. L. Trenholm were delivered according to the agreement, and a trust thereby devolved upon the appellants for the benefit of those who could bring themselves within its terms. Was the direction of Wagner and W. L. Trenholm necessary to authorize the trustees to deliver bonds to the respective creditors who claimed as *cestuis que trust* under the agreement? Was their interposition requisite for the transfer of the bonds? If so, by withholding their assent, they virtually could have defeated the trust. Does the agreement show that any control of the fund was to be reserved by Wagner and W. L. Trenholm? This doctrine of revocation, so questionable in voluntary settlements, cannot be applied to a trust founded on valuable consideration.

That a *cestui que trust* may renounce a provision in his behalf is not doubted. The advantage is intended for him, and he is at liberty to decide for himself as to its acceptance. Where it is not done by some positive act or declaration, the evidence to show a release of an intended benefit should be clear and conclusive as to the intention.

The mere delay in notice of acceptance, if not beyond the period limited by the instrument creating the trust, is not sufficient to divest the *cestui que trust* of his interest. The institution of suit on the demand, with the view of making George A. Trenholm a member of the firm, cannot be construed as a waiver of the right. A creditor having two sources of payment, by pursuing one of them, is not always held to have renounced or abandoned the other. The respondents would be bound by a much more rigid rule, if the question was raised between them and other creditors, or if there was a deficiency of assets to meet the debts of those who have come in under the order. But the fund is in court, ample for the satisfaction of all the creditors appearing and entitled to a distributive share of it, and the court can control its direction.—*Shubrick* vs. *Shubrick*, 1 McC. Ch., 406. The course and conduct of the respondents may have been vascillating, evincing a want of determination as to the course they should pursue for the security of their debt, but we cannot say that it evinces a purpose to reject the trust and look to some other mode of payment.

The order dismissing the motion in both cases has been heretofore filed.

*Wright*, A. J., and *Willard*, A. J., concurred.